Case number 21-5958, Karu White v. Laura Plappert. We're reluctant as not to exceed 30 minutes per side. Ms. O'Donnell, you may proceed for the appellant. Good afternoon. My name is Margaret O'Donnell. I represent, along with David Barron, Karu Jean White, whom we call Jean. I would like to reserve five minutes for rebuttal. Thank you. A death sentence was not inevitable in this case. The jury deliberated for many hours over the course of two days and were almost evenly split on the punishment after six hours of deliberation. The jury, however, heard no evidence about the following eight mitigating circumstances. The pervasive sexual violence in the family's home, that Jean's father, Karu's niece, and his grandmother, Kitty, beat his mother, Nancy, while she was pregnant with him. That Jean's grandmother, Kitty, with whom he lived most of the time, routinely beat him so severely that his legs bled and he suffered welds so bad that sometimes he could not sit at school. That his grandmother, Kitty, forced him to suck his urine out of sheets each time he went to bed. That adults made Jean, starting when he was a toddler, drink beer and whiskey often until he passed out, and that sometimes he went to school either with a hangover or even drunk. That he suffered numerous head injuries throughout his childhood, starting in infancy, and he also had an automobile accident in which he was traveling over 100 miles per hour when he went out the window and over a 30-foot cliff, and that he had an extensive history of severe seizures and that he attempted suicide in his life. There are seven ways the Kentucky Supreme Court opinion is both contrary to and an unreasonable application of clearly established law as determined by the Supreme Court in Strickland and in Williams v. Taylor. Five are related to the prejudice prong and two are related to the performance prong. I will start with the prejudice prong. The Kentucky Supreme Court ruled, quote, there is no possible or reasonable chance that the omitted testimony would have had such an unquestionably favorable impact that it would have changed the sentence of the jury, requiring Gene White to have shown that the evidence was so unquestionably favorable that it would have changed the sentence of the jury, is contrary to Strickland precisely because it is an outcome determinative standard that is more burdensome than Strickland's reasonable probability of a different outcome standard. The court in Strickland specifically held that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case. So I have a question. They, at the beginning of that section, they verbatim quote Strickland. Then they apply Strickland. And what you're quoting is their conclusory sentence at the end. And so I guess if you look at the Supreme Court cases like Viscotti, and in fact they quote the same language as Viscotti, where the Supreme Court instructed us that if they quote that language, we owe them the deference and they analyze it. We are not supposed to second-guess them. And then in Rogers and Viscotti and Johnson and Rogers R. Rombach, Johnson, the Supreme Court, Cullen v. Penholster, we're not supposed to fly-spec their opinions. We're supposed to read them as a whole. And so how can we use that sentence to say they unreasonably applied the law? Well, the whole paragraph, pardon me for my delay here, the whole paragraph also talks about it would not have been sufficient to counter or explain the brutalities of the three murders as well. That's merely doing the balancing we're supposed to defer to. I mean, that, the Supreme Court specifically said, in both Thornall and in Shin, that when they balance it, we're supposed to defer. So that's purely performing the role the Supreme Court instructed them to perform. But even relying on the brutalities and that it is related to the balancing, the fact that these crimes were terrible, and there is no question, but these crimes were terrible, that does not stop a jury or a court from determining that a sentence of life is something that should happen in a given case. But that's not, I mean, the standard for us on habeas review, according to the Supreme Court in Shin and Thornall, is whether any fair-minded jurist, whether a single, meaning any fair-minded jurist, could find that the balance was proper. If the mitigating evidence that you claim was left out is presented, would the balance, would the aggravator still outweigh the mitigators? If any fair-minded jurist could do that. And so, I mean, that's ultimately our analysis, right? Yes, yes. And it is our contention that the evidence that the jury did not hear was so significant that it would have impacted their decision about whether to sentence him to death. But my only point is, in Shin, and then I'll stop asking questions, I'm sorry to take up so much of your time, but in Shin, the Supreme Court specifically says that that's the balance that we defer to if the state courts perform it. It's the very language you're pointing to is problematic. Is the language where they're balancing? You know, Judge Thapar, all I can say is that that language that the Supreme Court relied on, the Kentucky Supreme Court, is contrary to the language and what the Supreme Court in Strickland determined was the standard, that it was, that it could not require more likely than not. And that is the bottom line of what the Kentucky Supreme Court determined. Isn't it, it's the key here that even though the Kentucky Supreme Court cited correctly some case law, in its application, in its conclusion, it makes its decision based on something that does not satisfy the language that it earlier quoted in making its decision. It instead imposed no possible or reasonable chance that the omitted testimony would have had an unquestionably favorable impact, that it would have changed the sentence of the jury. What is your best case for showing that the fact of that conclusion is what is an unreasonable interpretation of Supreme Court law? That it's the bottom line. It quotes other cases above that and that this is the bottom line in which they are saying this could not have made a difference, that it's not, that would have had such unquestionably favorable impact, that it would have changed the sentence of the jury. That's like the bottom line. They go through, they talk about other ways to look at it, but their bottom line is that it would not have made any difference. And that is what is contradictory. Wouldn't they say that no matter what? If they were denying habeas, they have to say it would not have made a difference. Let me read you the sentence with one word removed and then we can talk about the word. There's no possible or reasonable chance that the omitted testimony would have had such a favorable impact that it would have changed the sentence of the jury. Is that okay? Can you repeat? Which word did you remove? Well, let me just, I'll read you the sentence. I removed unquestionably. There is no possible or reasonable chance that the omitted testimony would have had such a favorable impact that it would have changed the sentence of the jury. I don't think so. It's the would have, I think, that are the problems. Would have had such a favorable impact that it would have changed. But where are you, but that's contrary to the Supreme Court because the Supreme Court says where you have significant aggravators then you need that. So they're just doing the inquiry, the fair-minded jurist inquiry, it sounds like to me. Right. If it had used language like might or maybe, then that would be different. But then aren't you running, I'm sorry to interrupt you, I apologize. Aren't you running contrary if you say might or maybe to Rogers' R.M. Bach that says you can't fly spec to Visconti, to Johnson, to Coleman. I mean the Supreme Court says this multiple times. We review judgments at the end of the day. Our job is to review the ultimate judgment. I mean Harrison V. Richter says if they say nothing, that's enough. And so what you're saying is if they write, so from now on state Supreme Courts should just say denied because if they write anything, we're going to fly spec it. I mean don't you have to look at the totality of it where they go through, state correctly the standard, do the weighing, talk about the evidence, and then ultimately have a conclusory sentence. I mean it just seems like we're violating so many Supreme Court cases if we go down this path. I mean we are talking about a case that Williams and Strickland are the controlling established law here and the Supreme Court's order is contrary to both Williams and Strickland. You concede that Thornell is also controlling, right? Thornell we think is distinguishable from Gene White's case for a couple of reasons. There was a lot of evidence that the jury heard in Mr. Jones' trial. There was even expert testimony about the head injuries and the abuse he suffered. That is not the case in Mr. White's case. I'm sorry to interrupt you, but I thought in Thornell and you can correct me, I'll read to you that there wasn't that the Supreme Court specifically said there was evidence introduced about the head injuries but that they did not put scientific evidence in and so it wasn't sufficient under Arizona law. My memory was they did have Dr. Potts. Dr. Potts testified at trial in that case, so there was some expert testimony. Maybe they presented more in post conviction, but Dr. Potts did testify at trial. So Mr. Gene White's case is different than that in that all the evidence that I talked about starting the argument was not presented. The jury did not hear any of that. Additionally, there were four aggravating circumstances found by the jury in Mr. Jones' trial and in Gene White's case, the jury found only one aggravating circumstance. I also think that the fact that Arizona at the time of Mr. Jones' trial was a judge sentencing state has all Mr. White has to show is that there is a reasonable probability that at least one juror would have made a different decision and we believe that the evidence that was not presented in this case is that evidence that would have made a difference to the jury. So you're relying on a probability sufficient to undermine confidence in the outcome. Yes. Yes. And, you know, this evidence was collected in 11 days. 11 days. And, you know, they came across some mitigating evidence in their attempt to come up with an insanity defense but the wealth of evidence that the jury Can I interrupt you again? I'm sorry. I don't know if you can fix this. It just got really blurry for me. I don't know what caused it. Marshall, the timer also froze. Just so you know. I don't know when it froze. I just noticed it. Now it's going. I don't know how to make sense. That's okay. Sorry. No, you're okay. We can hear you fine. Thank you. This is the first oral argument I have ever done my video. So I'd like to return or continue that the court Supreme Court interpreted Williams to be only applicable if no investigation was undertaken and therefore the court disregarded Williams entirely. That's contrary to Williams because the Supreme Court found in Williams that Williams counsel had undertaken some investigation and did present testimony at trial. The court's ruling is also contrary to clearly established law because the court held that any more evidence in Mr. White's case would have been cumulative. The plain fact here is that the unpresented evidence of head injuries, seizures, forced alcohol consumption by adults, severe physical abuse by his grandmother, rampant sexual abuse in the home was not cumulative because the jury never heard any testimony concerning this. So the fact that the Supreme Court determined that it was cumulative is an unreasonable application of Strickland. Let me ask a question at this point. Does it make any difference that when counsel talked both to the defendant and to his family and did make inquiries, you're not taking the position that they made no inquiries as I understand you. So does it make any difference that this information which they did make an attempt to get was not given to them? The inquiries that counsel made were to support their belief that they would go with a not guilty defense or an innocent defense, innocence defense. But that wasn't unreasonable at the time. I mean, I think everyone agrees that the prosecution had a slim case until one of them flipped. There was significant evidence maybe not direct but they had the witness who dropped the three boys off outside the store. They had the little boy who wasn't there. I mean, to Judge Batchelder's question, they did 12 hours of interviews during this. Their theory because of the interviews and because of the family's answers was he was innocent, which he maintained and then that if somehow he got convicted they would show how he was raised well, a good person, this was a one-time thing and that he had no prior criminal violations, etc. So that was their theory at the time until the flip and then the family started spilling the information. The family testified that no one asked them any questions concerning his background. It was all and let me say this, the obligation under Williams is for counsel to undertake a reasonable, thorough investigation of the client's background. But that depends on the defense as the Supreme Court has said and in this case I assume you agree a contemporaneous statement at the time is much more probative than what we're trying to look back now. You agree with that, right? Yes. And if you go back and read the opening statement of the trial he lays all this out in amazing detail. He lays out how the family stonewalled, then he lays out because they didn't want to tell about this behavior and then he goes through all this behavior which is why the Kentucky Supreme Court said it was cumulative. I mean, I get that there's little details he didn't get or big details depending on how you look at it that he didn't put in but the reality is what he got from five interviews was enough to present what they believed was a good insanity defense at the time. Their testimony in post-conviction proceedings was that they were desperate to find something at that point and our position is that whether you are going with an innocence defense or an insanity defense or whatever defense that you are undertaking that you at the time of this trial had a constitutional obligation to test that defense but also to undertake a thorough background investigation. Does the background investigation here contain any evidence of his checking on their statements? What I'm reading in this record is a statement that I talked to them for a long time and I checked it out but I don't see the particulars of how this council actually checked out the statements of the family or looked beyond or investigated in ways that would have actually confirmed what he was being told. Have I missed something in the record? No, you have not and if you look at  counsel's testimony, he at one point said I'm not talking about a lengthy conversation with family members with Kitty Neese, his  Kitty Neese testified at trial were these things told to us prior to that time? No, sir. Why not? I was never asked. When was the first time I asked any questions about Gene's mental health? If you don't remember the exact date, tell us whether it was in the last few days or it was in the last few days. Kevin Charters, the lawyer, testified I didn't really ask her about problems she may have had with Gene. I just asked if there was anything she could tell me that would indicate that a boy that she was saying was a pretty nice kid was capable of doing these things. He also testified that the questions that he asked were to the co-defendants. Are you guys telling us the truth? So their investigation had to do with trying to solidify whether they could do an innocence defense, whether it would stick up, not to do any background investigation about Mr. White. I will also say that once they started asking the questions, the information flowed and flowed and flowed when the right questions, when the right approach was taken to them. But until then, they were focused on the insanity, or not the insanity defense, the innocence defense. So they were not interested in asking questions or undertaking the constitutionally required investigation they were required to undertake under the Sixth Amendment at a minimum. So back to the Supreme Court order, the court also ruled that it could have been detrimental or perhaps counterproductive. This is also contrary to Williams because in that case, not all the evidence that post-conviction counsel found was favorable to Williams, but still the court determined that the failure to introduce or to find the favorable testimony was not justified by the tactical decision to keep it out because of the bad evidence that was coming in. So they did not fulfill their obligation to conduct a thorough investigation as Williams required. The Supreme Court, the Kentucky court ruled that the unprecedented mitigation would not have been sufficient to counter or explain the brutalities of the three murders. There is no question but these murders were terrible, they were brutal. Yet, unprecedented mitigation evidence does not need to counter or explain the brutalities of a crime to satisfy Strickland's prejudice requirement. Only a reasonable probability that one juror would vote for life and a juror can vote for life as the Supreme Court recognized in Williams when there are terrible crimes. Do you concede there's no nexus in that regard between this mitigation evidence and the crime then? You know, the head injuries, the... You don't have an expert still today that says that. So in the 40 years since, no one's got an expert that says that pursuant to Thornell. Well, it's not for lack of trying to get an expert that we don't have an expert. Right, but I mean even the defense attorney or it might have been habeas counsel, I don't know, admitted at some point during the state proceedings that with 11 days once you discover it, it's almost impossible because they don't have mental health officials waiting to make these diagnoses. It's not like they're sitting on their hands. Well, and something to add to that, Dr. Graniker, who did one of the initial, one of the competency evaluations, recommended that further evaluation at the University of Louisville was necessary and required. Sure, but to show prejudice, even today we don't have someone to make that nexus, correct? I'm not sure I followed the question. You don't have an expert, a neurologist that has made the leap from his head injury to the nexus to the crime or mitigating any of that. We don't have an expert to explain the significance of this to us. We do not have an expert in this case, but I believe that lay people can use their own experience about in utero beatings, being hit by a tire buddy. I don't disagree with you on that, but you're faulting defense counsel for the very thing you're now saying lay people could do, and yet in 40 years since, no one's gotten that expert. You see what I'm saying? It's pretty hard, I just think respectfully, that it's pretty hard for a court to say, oh, the attorney in 11 days failed when in 40 years no one's gotten that person. We did not allege that they were ineffective for failing to get an expert to testify. The allegation of ineffective assistance of counsel related to the fact they knew about these head injuries, and they asked the witnesses about them in the competency hearing that was not in front of the jury. They asked them about these head injuries. They presented all kinds of testimony about his difficulties in school. They presented no evidence about the seizures that he, the witnesses who testified in post conviction, there were numerous ones of them who talked in great detail about what he looked like when the seizures happened, how they would keep him from biting his tongue or swallowing his tongue. The jury heard none of this, and we are not alleging that counsel failed in some way by not requesting an expert. We just believe that evidence, especially if they were having an insanity defense, they didn't even have any experts to testify about the insanity defense, it would seem that head injuries are the type of thing that you might raise with the jury if you were raising an insanity defense. In conclusion, it is our contention that we have overcome the many facets of 2254D that in the Supreme Court, in the Kentucky Supreme Court order. We also believe that counsel's representation fell below an objective standard of reasonableness, because they did not fulfill their duty to do a reasonable and thorough investigation of their client's background. The fact that he was claiming innocence does not stop that obligation, and that given how long the jury was out in this case, there is a reasonable probability that less than a death sentence would have been returned. Thank you. Thank you. You'll have your rebuttal time. Thanks. Ms. Hedges. Thank you, Judge Strach and members of the court. Elizabeth Hedges on behalf of the warden, and I'm with the Attorney General's Office of Kentucky. I want to jump right in on what Judge Thapar was asking about, which is the standard here, and this case can be decided on the standard. As Judge Thapar's questions just recognized, and as we argue in our brief, Kentucky Supreme Court made a merits decision on both the deficiency and the prejudice prongs of Strickland, and therefore, this court cannot reverse unless that decision was so unreasonable that it was beyond any possibility for fair-minded disagreement under Harrington v. Richter. So therefore, because the Kentucky Court made a reasoned decision, this court does have to defer to the balancing that it did, and fly-specking the opinion is exactly what this court is not supposed to do. And I do want to address... Let me understand why it's fly-specking an opinion to look at the conclusion of the court that is at odds with the Strickland standard. I'm struggling with that. The Strickland standard is known everywhere. You know, it's a reasonable probability that is a probability sufficient to undermine confidence in the outcome. Why isn't their statement about unquestionably favorable impact would have changed everything? Why isn't that just simply so much more strict a standard than the actual Strickland standard, that that would move... And that may beg the question of how the case ultimately comes out, but doesn't it move us away from deference into de novo review? Your Honor, I have a couple responses to that. So first of all, I would definitely read that language differently. I think the key language in the courts in that sentence is that there was no possible or reasonable chance. And that's exactly the question that Strickland asked. So even if we were on de novo review, which we're not, but even if we were, that question that Strickland asked on prejudice is whether post-conviction counsel has shown a reasonable probability of a different result. But the Kentucky Supreme Court said there's no possibility. Well, but the problem for me is then we define what reasonable probability is. And reasonable probability is only a probability sufficient to undermine confidence in the outcome. So it doesn't help me for you to say, well, reasonable probability, that's what they're asking about unless you define what a reasonable probability is. And it is one in Strickland that undermines confidence in the outcome. That's right, Your Honor. And I just read the Kentucky Supreme Court to have said there's no reasonable probability that was sufficient to undermine confidence in the outcome. And I think going back to something we were talking about earlier, I do think it's really important to look at the decision as a whole because the question under is whether the state court's decision or reasoning resulted in a decision that was contrary to or an unreasonable application of clearly established federal law. And so we have to look at the decision as a whole. We can't pull out a statement from it. And on that point, I think this kind of came out in some... You can't, under your argument, if the court, if the state court below had said, here is our holding, and then stated something that was absolutely incorrect, then that is insufficient to avoid deference because they actually included a quotation at some point in their analysis and yet applied it in a way that did not honor the definitions within the very issue that they were addressing here strictly. Your Honor, I think if the court had said something that was completely wrong and inconsistent with a direct holding of the Supreme Court, then we would be in a different ballpark. But that's just not the ballpark that we're in. I think what's happening here is that we're kind of zooming in, or White certainly is zooming in on some one sentence in several pages of a reasoned decision and saying, well, this shows that they made the wrong decision. But, in fact, what you see the court doing, it's quoting Strickland, it's quoting Williams, it's quoting Strickland's language that yes, what we do look to, in part, to determine deficiency is the information that counsel got from their own client, which I think goes back to the question Judge Batchelder was asking my friend on the other side. And so the court was quoting line after line of these controlling U.S. Supreme Court decisions that do provide an answer here and then pulling out one sentence and putting a magnifying glass at the grammar of it is just not what this court is supposed to do under EDPA. So that would be my response on that, Your Honor. I also want to go to the evidence on this prejudice issue. I do want to push back on some of what's been said about what evidence was and was not presented. So I think there was actually so much evidence presented that we describe in our brief, but even more than what counsel for White put in their brief. So, for example, on the issue of whether White was beaten by his grandmother and his mother, there was testimony in the record that he was beaten by his mother with anything she could find, that she tried to smother him when he was a baby to the point that he turned blue, that his grandmother beat him, that his grandfather beat him after trying to get him to lie about seeing his grandmother with another man. There was also testimony about, so on the alcoholism point, there was testimony about his father being a drunk. There was testimony about White himself abusing drugs and alcohol in his teens and perhaps earlier. And, in fact, I was struck getting ready for this argument, again, by how many pages of testimony there were from White himself on the amount of abuse of substances that he did. And, surely, if as White is arguing, lay people can make an inference of a brain injury from that sort of testimony, it was certainly in front of them, especially stuff about his mom trying to smother him and hitting him with things. Can I ask you a question? Did the Kentucky courts make findings of fact? In other words, I couldn't find anything below the Supreme Court. Is there a trial court record or opinion during the habeas proceedings where they made findings of fact? Your Honor, there is an 1142 decision that the trial court made before the relevant Kentucky Supreme Court decision in this case. I believe it's cited in my brief. I can look it up for you really quick if you want. Is the decision in the record itself? If it is, we can find it. Yes, Your Honor. And I do believe I cite it in the background section of my brief. Okay. Yes. So, again, I think to Judge Batchelder's question, especially kind of shifting around to the deficiency point, Judge Batchelder raised a really good point, which is does it matter what his clients, what counsel's clients told him? And it does matter. Strickland itself said that a defense strategy is in part based on what your own clients tell you. And there are more recent cases that reiterate that point and essentially say that if counsel's client is throwing him off the scent by lying to him or withholding information, then that kind of builds in to the deference that we already apply under Strickland. What cases are those? So, we cite them in our brief. There's a Seventh Circuit case, Thomas v. Gilmore that uses that throw off the scent. Do you have any Supreme Court or just the seven? Yes, Your Honor. So, Strickland does say that. Let me actually... I have it here. I thought you said more recent cases. Maybe you meant the circuit or maybe I misheard. Yes, Your Honor. I think there is a more recent Supreme Court case. It's not leaping to mind right now. That's fine. I'll find it. I'm concerned about the existing standards at the time from the ABA standards and what counsel really engaged in here. I thought the ABA standards were clear at that point. In 1980 case they're cited, a Supreme Court case that it's the duty of the lawyers to conduct a prompt investigation of the circumstances and to explore all avenues leading to facts relevant to... And then they say it's not just the merits of the case. It's they need to come with an investigation into the penalty phase in the event of conviction. I just see almost nothing in this case where those attorneys considered the penalty phase. I mean, even the judge said to them when Fisher flipped, you know, boys, everybody in the courthouse and in the public knows that this boy was likely to flip. How could you not know that? And plan accordingly. Your Honor, they did not. Help me understand why they satisfied the ABA standards, lesser standards than today for sure. But I don't see them having satisfied those in 1980. Yes, Your Honor. And I'm glad you're giving me an opportunity to answer this because there actually was more of an investigation than might appear. So I say testimony in my brief from Mr. Charters, who was one of the counsel, who said that he did have a penalty strategy in mind, even before Mr. Fisher flipped. And that strategy was going to be that he was going to present evidence of statutory mitigators, such as the youth of these defendants and their lack of a criminal background, etc., etc. But that had to do, that was a defense that he did look at. These are good boys and they really didn't do it. And then, oh, now I'm caught because I'm caught flat-footed and did not investigate the penalty. So now I'm just going to say, well, if they're convicted, they're really good boys, so you should not have the death penalty, even though it's a terrible crime. These were not those kind of kids. It was out of character. That's not a consideration of the fact that these guys might have been guilty. And he even said  charters understood he testified at the post-conviction evidentiary hearing that he knew before the trial that White had unexplained money after the crime, would go to a remote location and return with a coffee tin containing change like that missing from the crime scene, and purchased a used car in cash shortly after the crime. Why didn't that knowledge suggest to this attorney that he needed to look seriously at whether these guys were guilty and prepare for that eventuality? Right, Judge Strange. So I think I would say that they did prepare for that eventuality. Now, 45 years later, we're all looking back at this with a magnifying glass and we're saying, would I have done this the same way? I don't know. Maybe, maybe not. But that's not the inquiry here. The inquiry is whether giving double deference under EDPA to the state court's decision, whether it was so crazy what counsel did that every jurist would have a disagreement that every reasonable lawyer would have done this. Let's assume for a moment that, just make the assumption in answering this question, that this is de novo review. The Kentucky Supreme Court did erroneously state the law and rely on it. So assume it's de novo. Then what is your answer to that? That's a very different issue from EDPA deference. So what's your answer based on this knowledge that counsel had beforehand and did not develop or further investigate? Your Honor, my answer would be that Strickland is satisfied here because what Strickland says is that there's, and the cases following it say there's a presumption of reasonableness, which basically means what the courts have said is that means unless there's direct evidence that the reason certain evidence wasn't presented or investigated is was done so for an unreasonable reason, then our assumption is that counsel had a strategic reason. And I just, again, I think we need to step back in time here and look at what was unfolding. You had the defendants all saying they're innocent. I have citations to parts of the record in my brief where counsel testified regarding how they kicked the tires on that alibi defense. They talked to people who claimed to have seen these guys somewhere else at the time of the crime. They separated the defendants into rooms and said, are you lying to me? Are you lying to me? They talked to their family. Is there anything in these guys' history that would indicate they'd do something like this? Nobody was telling them anything except that these guys were innocent. And so I think when you look at that, you have to say, well, where is their time going to be spent? Is their time going to be spent running down everything about these guys' backgrounds when family isn't telling them that there's anything? What about the counsel's statements to the court? Well, we were just the most gullible attorneys in the world. We just didn't see this coming. Your Honor, I think the response is well, you were asleep at the wheel, boys, because you didn't look for it, because I knew about it, and so does the public. So, Your Honor, I think counsel definitely said to the court that they were very surprised, and they did testify in post-conviction that they expected. They believed their clients initially, but they didn't say that they had no plan in mind for a penalty case. They said that they expected to win, and that they also felt that the prosecution felt that it had a tough hill to climb, but they didn't say they made no investigation, and what we see is that they did make an investigation. Now, again, is it the same investigation that all of us would have done? Maybe not, but that's not the question. The question under DeNovo would be is it so unreasonable what they did that no reasonable lawyer would have did it, and that's just now what we're seeing on this record here. They had so many different strategies competing for their attention, and what the courts have said is that we presume the decisions they made were reasonable, and I think so that would be my answer on DeNovo, but again, that's just not where we are. Instead, we're in the double-deference world of Strickland, and therefore, there's even more reason to say that this was a reasonable decision, and I would point the court to Van Hook, which is a Supreme Court case from not too long ago, because I think it really does a good job of responding to exactly the argument White is making because that's a case where counsel at the trial level had presented some evidence of mitigation, but then in post-conviction, the defendant was saying, well, there were red flags. He should have found more, and what the court said was no. At a certain point, draw a line, and you decide whether more evidence is going to be cumulative, and that's the analysis that the Kentucky Supreme Court did here, and it was correct analysis. Can I ask you about counsel's decision to put on evidence of bestiality and the sexual advances? Was that deficient? No, Your Honor. I think if we were to, again, say it was deficient, we would be engaging in the kind of hindsight that the Supreme Court has said we're not supposed to do. To take just a couple of specific points on that. First of all, their primary defense at that point was insanity, and as counsel on the other side alluded to, their experts would not say they did have two psychiatrists examine White, and they wouldn't say that he was insane. At that point in time, 45 years ago, they thought, well, how are we going to convince these people that he was insane, because he definitely did it, and so they had to get in. According to counsel's post-conviction testimony, he said, we were looking for all the evidence of weirdness we could find, and so they put in a lot of true stuff in the record, and then they put in some stuff that 20 years later, some witnesses said was not true. Now, I would also point out that I went back and looked at some of the testimony about the sexual advances to his family members that he's now saying was not true, and it's actually a mixed bag, so there was actually some post-conviction testimony from his half-sisters who had given that testimony that was actually consistent with what was given to trials, so it's not all inconsistent. I'm not going to say it was all consistent because there is evidence that some of it was, but again, family kind of was lying to counsel from beginning to end in this case, and what they ended up presenting at trial, they testified was meant to serve both the insanity defense and, as a backup, a mitigation strategy. There's testimony from Kevin Charters in the record that he thought this served both of those ends, and, of course, what we see is the jury rejected the insanity defense, but then in penalty phase closing argument, again, counsel really hid that evidence regarding his upbringing. But isn't that it's problematic to me that having failed to prepare and then finding himself entering an insanity defense, why was it not ineffective assistance to fail then at the penalty phase to also make a turn and try to provide other evidence? Isn't it problematic that he didn't then come forward or know to come forward with the physical and organic brain damage, the seizures, all other information, rather than just kind of a few pages of talking about what they had heard at the trial, rather than undertaking a true mitigation defense that might enable his client not to receive the death penalty? Your Honor, on the organic brain damage point, this goes back to something during the previous argument, which is that there's still no evidence in the record of that, so even though counsel, I'm sorry, even though White is currently arguing that there was head injuries, this was anecdotal evidence, and this court has said, there's a case called Foley v. Parker where this court rejected similar evidence basically as a basis for relief and said that if you just got anecdotal stories of head injuries, but you don't actually have any evidence that there's brain damage, that is not enough. If you haven't investigated to know that he ran a car off of some kind of a cliff and was thrown out the window and was knocked unconscious a number of times, if you failed to do the investigation for the penalty phase, how can you then satisfy your duty as counsel to undertake a true mitigation defense? Your Honor, I have a couple of responses. The first one is, there actually was some of that testimony presented during the competency hearing, which is pretrial. There was some of that testimony, that kind of testimony presented, and I think the ... Correct? The competency hearing was presented to the judge. That's right, and so the point I was going to make is, when we see that, or even when we see an absence of evidence that counsel didn't know about this, then that's when we get into the world of, there's a presumption that the reason that evidence wasn't presented to the jury was a strategic call. And I was just struck when I was preparing for this case by how much mitigation evidence was presented, and I can definitely see a lot of reasons why reasonable counsel would look at all of that and say, okay, we've given the jury a lot. Giving them more is potentially just going to be a waste of our time or worse. And I would just say, again, on the heteron injuries point, I could go on about the evidence that did go before the jury. One of his sisters testified that when they were kids, she got in a fight with him, and she thought she had killed him because, I guess, she hit him so hard. And then she had to come back and check on him and got up, and so there was testimony that his father threatened to kill him. There was testimony that he saw his father killed in front of him when he was five or six years old, maybe younger. And so I think we just need to remember that what Strickland says is there's a presumption that the decision counsel made not to present additional evidence was reasonable, and I would go back to Van Hook on that point, too, which addressed the deficiency prong, and that wasn't even an Edward case. So we're, you know, even if the court were doing de novo review, that would be the appropriate decision to look at, but we're in a more deferential posture than that, even. On the nexus point, so I do want to push back on one characterization of the Kentucky Supreme Court's opinion. So that language that the Kentucky Supreme Court has about how there's no indication that the additional evidence would have countered or explained the brutality of the murders, that's actually exactly the sort of prejudice analysis that the courts are normally engaged in doing, and the Thornell decision, which Judge Zafar was asking about earlier, recently rejected the argument that there's some kind of constitutional problem with the state court looking at evidence and saying there's no nexus between this and the crime, and therefore finding it unpersuasive. The key inquiry that the state court, what the state court is supposed to do with Strickland is they're supposed to take all of the mitigating evidence and all the aggravating evidence and weigh it. And so that includes all the mitigating evidence that came in, as well as everything that could have come in against all of the aggravators. And speaking of the aggravators, I think this also came up when my friend on the other side was speaking, this question of how many aggravators there were, Van Burke says it is incorrect, it's an error to look at the number of aggravators as opposed to the weight of the aggravators. So in this case, we had, kind of similar to Thornell, we had a statutory aggravator, but also we had all of this other evidence of how brutal the crimes were, and we had evidence that White was the ring leader, that he told the other guys who were juveniles how to cover up their involvement in the crime. Let's look at some of the evidence on the other side. I think it's true on this record that the club or branch that was wielded by Tommy Bowling had the Lulu Gross' hair on it, which was an indication that that was the weapon that struck the fatal blow to the victim, as opposed to the actions of Mr. White. I mean, isn't that an important analysis? And yet early, another counsel, he objected to the admission of the club with her hair on it. Why would his own counsel object to something that might show him not to be the actual killer? Well, Your Honor, I'm not exactly sure why. There could be reasons why trial counsel might make that decision. In response to why did you make that decision, he said, I don't know. In the post-conviction testimony? Yes, I believe so. It was in post-conviction. He doesn't know why, but it certainly was to the detriment of his own client at the time. And so I don't think it's surprising that he wouldn't remember. But the other point I would make is the jury found White guilty during the guilt phase of all three murders. And under Kentucky       law, that was a valid finding. Now, there was testimony in trial that was very, very clear and unrebutted that White had struck Sam and Charlie. There wasn't direct eyewitness testimony that he had struck Lula. But the jury knew that. The jury heard Fisher say, I heard someone hit Lula. And the jury also knew that all of them had weapons. So the jury heard all of this, and they found White guilty of each one. And at this point, White's only arguing that he shouldn't have gotten the death penalty. And I know Your Honor is aware of that, so I'm not Yes, we're in mitigation. Right. And so, and he's not even arguing that he didn't hit any of them. He's not even arguing that he didn't commit the murders. He's just saying, all of my background was so terrible that if the jury had heard more about it, they would have given me less than a death penalty. And a point I want to make about the time that the jury deliberated, that is not something that the Supreme Court has said is relevant to the prejudice question. And the cases that counsel cites from out of circuit, one of them isn't even the death penalty case. And in both of those cases, the jurors deliberated for longer than they did in this case. So I would request that the court look back at the Supreme Court decisions, which don't say anything about that. But also, I think even if it were a factor, that wouldn't be something that would cut in favor of prejudice here. But it shows that there were questions, and the length of deliberation matters. Why can't that be considered? Well, Your Honor, I'm not saying it's wrong in every case for the court to consider it. What I'm saying is that we're looking at a body of clearly established federal law that is only consisting of U.S. Supreme Court decisions, and none of them say that if jury deliberates for X amount of time, therefore, we think that weighs in favor of prejudice. And so, I just think it's not appropriate for consideration at this stage in this case. I'm not saying it's never going to be relevant, but just, in this case, there's just nothing exceptional about what happened in the jury room. I mean, this is a death penalty case. I hope they're taking it seriously. I hope they're taking their time with it. So, I guess, what I would kind of, to wrap up here, unless the court has more questions, I would just remind the court, the Supreme Court has said again and again and again, including in Penholster, which is a fairly recent case, that this court has to afford double deference to a Strickland decision on the merits by a state Supreme Court. And so, we could all talk, and we would like to, I'm sure, because we're lawyers, we would like to talk about how we might have made different decisions at trial, or how we think different decisions would have played out differently, but that's just not the inquiry the court's engaged in here. The inquiry the court's engaged in is if every fair-minded jurist would have agreed that every lawyer who was reasonable would have made different representation decisions, and that if different decisions had been made, that it was so likely that a different result would have been reached by the jury, that the state court's decision to the contrary was beyond any possibility for fair-minded jurists. A reasonable possibility, right. If counsel, if post-conviction counsel were able to show that there was a reasonable possibility of a different result. Probability, sorry, I used the wrong word. Didn't the Supreme Court recently define that language in Shin as substantial probability and say a reasonable probability means a substantial, just not conceivable, likelihood of a different result, and that it then said when you're doing double deference, you're supposed to do the fair-minded jurist inquiry that you just quoted? Yes, Your Honor. So I think we're saying the same thing. So the court recently reminded us that although this is not a preponderance standard, the difference is only rarely going to matter. So this is not just a mere possibility. Counsel would have to show a reasonable probability, which means a substantial, not just a conceivable probability of a different result. And that's the Strickland standard, but we're in a world where there's even another layer of deference on top of that because of that. So with that, unless there's further questions, I would just ask that the court affirm the district court's denial of White's claim. Thank you. Further questions? No, thank you. Ms. O'Donnell, your rebuttal time. I think your microphone is off. I had hoped I would say I have three points to make, but I probably have about 12 or 13. The first one I want to start with is just to remind everyone here that Gene White was 20 years old at the time of February 1979. Also to judge the PARS questions about the trial court, not the trial court, but the postconviction court order. There is a postconviction order. I looked at it recently, and there are no findings of fact in that postconviction order. Thank you. I would also note that the Supreme Court, the Kentucky Supreme Court, talked about one witness, Dr. Evanson. But other than that, they said that there was five days of testimony and 43 witnesses who testified in the postconviction hearing. I counted the other day 30 of those were mitigation witnesses who testified. I would also say we need to be straight here. There was no mitigation investigation undertaken. They had 11 days, most of the time when they were in trial, to try to come up with evidence to support the insanity defense. It just happened that a lot of the evidence that they received had a mitigating value to it. They should have done that over again? They should have done another investigation to get the same information? They should have undertaken the investigation at the start of the case. They were constitutionally obligated to undertake a reasonably thorough investigation of his background and they did not do that. I would like to mention this. It has always just bothered me, but the district court, the Kentucky Supreme Court determined that these three guys, kids, were represented by two different lawyers, that they were not representing all three together. They specifically found the district court, the Supreme Court, that Mr. Charters was not representing Mr. White until Chuck Fisher turned state's  My question is, what would he even have been talking to Gene White's grandmother about at that time if he was not representing Gene White at that point? We concur with Judge Sipar that it was deficient to present evidence of bestiality, sexual contact with his ancestors, as I call them, and perhaps if they had undertaken a complete and full investigation and learned the extent of the rampant sexual violence that went on in that home, it would have perhaps placed some of that in context. So we would also say that any reliance on Gene White's testimony is not under Skipper, is not something the court can take into consideration in determining the weight of the testimony. We think it's also important that the client that Gene White never told his lawyers to not present mitigating evidence, to not, it's not like one of those cases in which the client says don't investigate this. And also in the record it's kind of, you know, well, both co-defendants testified in the post-conviction proceedings and they testified that these lawyers knew they were guilty. And just the whole overarching and one final thing, families said in post-conviction proceedings that they would have told client or lawyers this investigation had the lawyers just asked them. They did not undertake the investigation and when they did, it just fell like low-hanging fruit because this family was so dysfunctional. Thank you very much. We thank you both for all the work you've put into this case. It's a very difficult one. I see Ms. O'Donnell that you are a CJA representative. I am. You are owed the gratitude of the court because it takes two people to really present a case and to delve down into what each side of the case has. We can't do our job if we don't have both of you here and we thank you for being willing to undertake a death penalty case under the Criminal Justice Act. Thank you both. It will be taken under advisement and an opinion will be rendered in due course. That is our only case today. Mr. Gifford, you may adjourn court. This honorable court is now adjourned. Counsel, you can both disconnect at this time and Marshall, if you could confirm disconnection when it occurs, please. Yes, sir.